UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| WILLIAM AND PATRICIA KEES, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) No. 3:02-CV-2 |
| | ) (Phillips) |
| CELTIC INSURANCE COMPANY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

This is an action by an insured against an insurer to recover under a contract of health insurance between the parties for payment of medical expenses associated with insured's heart condition. Furthermore, the insured is claiming bad faith refusal to pay a claim under the policy. The defendant has moved the Court for summary judgment on both claims; the plaintiff has responded in opposition; and the defendant has replied. For the reasons that follow, defendant's motion for summary judgment in regard to both claims is **GRANTED**.

## LAW APPLICABLE TO RULE 56 OF THE FEDERAL RULES OF CIVIL PROCEDURE

Rule 56 of the Federal Rules of Civil Procedure, provides that summary judgment will be granted by the court only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. The burden is on the moving party to conclusively show that no genuine issue of material fact exists. The

1

court must view the facts and all inferences to be drawn therefrom in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Morris to Crete Carrier Corp.,* 105 F.3d 279, 280-81 (6th Cir. 1987); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943 (6th Cir. 1990); *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987).

Once the moving party presents evidence sufficient to support a motion under Rule 56, Federal Rules of Civil Procedure, the nonmoving party is not entitled to a trial simply on the basis of allegations. The non-moving party is required to come forward with some significant probative evidence which makes it necessary to resolve the factual dispute at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986); *White,* 909 F.2d at 943-44. The moving party is entitled to summary judgment if the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof. *Celotex,* 477 U.S. at 323; *Collyer v. Darling,* 98 F.3d 220 (6th Cir. 1996).

## **BACKGROUND**

Mr. William Kees (hereinafter, "Mr. Kees") with his spouse completed an application for health insurance on August 14, 1999 with Celtic Insurance Company (hereinafter, "Celtic"). Within the health insurance application, the Kees were required to complete a Medical Questionnaire.

The application indicated that Celtic expected the Kees to be truthful and to fully disclose their medical condition(s). Directly above five numerated medical inquires, the Medical Questionnaire stated:

> For this insurance to be in force, the following health questions must be answered fully and truthfully to the best of your knowledge and belief and all of the health information (including routine physical exams) must be provided, and Celtic Life Insurance Company must approve this application. No one may change this requirement in any way. If any information on any form is misstated or omitted, coverage may later be rescinded. Rescission voids coverage from the effective date, and any premiums already paid will be refunded, minus any claims already paid . . . .

The pertinent inquires of the Medical Questionnaire were as follows:

2. Have you or any dependent(s) to be insured ever been treated for, had symptoms of, or been advised or counseled that they have or may have had a heart condition, (including a heart murmur), stroke, high blood pressure or other circulatory disorder, blood disorder, diabetes, cancer, tumor or cyst, liver, kidney, genital or urinary tract disorder, seizures or other nervous system disorder; back, spine, joint, or other musculoskeletal system disorder, arthritis, skin disorder, digestive system disorder, asthma, allergies or other respiratory disorder, eye or ear disorders; alcohol, substance or drug abuse or dependence, emotional, psychological, psychiatric or nervous condition or disorder, or history of sexually transmitted disease(s)?

3. Have you or any dependent(s) to be covered been hospitalized or had medical or surgical consultation, advice or treatment for any condition(s) (including medication, psychological or martial counseling or therapy), or been advised of any abnormal test results or laboratory findings during the past 24 months? Are you or any dependent(s) to be covered scheduled for or awaiting the results of any tests, biopsies, procedures or lab work?

The Kees answered "No" to Question 2 and "Yes" to Question 3. For any response to an inquiry that indicated the existence of a medical problem or condition, Celtic required

3

applicants to elaborate on the medical condition or problem by completing an "Additional Health Question Information" sheet. With regard to Question 3, the Kees were required to state or describe the medical condition; indicate the date of the condition; details of treatment (including medication if any); degree of recovery; and date of recovery. Mr. Kees indicated that he had a check up on May 1999 "before dieting;" stated that his recovery in relation to the May 1999 check up was "full;" stated that he had a check up scheduled for August 31, 1999; and did not list any medications.

The signature page of the application, entitled "Agreement and Signature," stated:

> **TRUE AND COMPLETE:** To the best my knowledge and belief my answers to the questions on this application and any additional information I have provided are true and complete. I understand that it is my responsibility to provide truthful and accurate information . . .

The Kees signed the application on August 14, 1999.

On September 3, 1999, Celtic submitted additional inquires to Mr. Kees. Celtic's inquires and Mr. Kees' responses were as follows:

> Questions: What were the result of the 5/99 checkup?
> Answer: Fine
> Question: How much weight has been lost since 5/99?
> Answer: 12 lbs
> Question: Was any medication prescribed to assist dieting? If so, what?
> Answer: No - cut back on fat grams and red
>  was advised to lose few pounds
> Question: What were the results of your 8/31/99 check up?
> Answer: Fine - went back for weight check

On September 24, 1999, Celtic sent a letter to the Kees informing them that their coverage had been approved with an effective date of August 16, 1999.

4

In June of 2000, while the Celtic health insurance policy was in effect, Mr. Kees experienced symptoms indicating a possible heart condition. He was tested, treated, and ultimately underwent heart by-pass surgery, incurring medical expenses. Following Mr. Kees' claim for benefits as a result of heart related ailments, Celtic began an investigation to determine if Mr. Kees had provided true and complete answers in his health insurance application. As a result of the investigation, Celtic uncovered that Mr. Kees did not report all of his medical consultations pursuant to his insurance application. Specifically, Mr. Kees neglected to report medical consultations with his local medical doctor, Dr. Diane Fabricus, on March 4, 1999, March 9, 1999, and April 22, 1999, as well as, a medical consultation with his optometrist, Dr. Bob Larson, in the Spring of 1999. Furthermore, Mr. Kees did not report certain conditions disclosed or noted in Dr. Fabricus's medical records. Medical records from Dr. Fabricus's office indicated a history of diabetes mellitus, hypertension, and hepatitis. Notably, the records indicated that Mr. Kees was diagnosed with hypertension and Type 2 diabetes in March of 1999 and placed on medication.

Additionally, the medical records from the August 31, 1999 consultation with Dr. Fabricus disclosed that Mr. Kees was noted to have borderline high blood pressure and that he was prescribed glucotrol once a day.

Mr. Kees admits and recollects that his optometrist, Dr. Larson, examined his eyes for blurred vision in the Spring of 1999; suggested to him that his blurred vision

5

could be a possible diabetic symptom; and told Mr. Kees to see his local medical doctor. Further, Mr. Kees recalls and admits that Dr. Fabricus examined and performed tests on him and told him that he had some sort of possible temporary diabetes due to drinking large amounts of orange juice containing massive amounts of sugar. Mr. Kees also states that Mr. Fabricus prescribed him a sugar meter. He did not recall if Dr. Fabricus put him on medication for diabetes and states that if she did, it was only for a month or so as he does not recall taking any medication for diabetes when he filled out the insurance application. Mr. Kees believes and asserts that any problems that he may have experienced were short term and caused by diet. He states that, after three or four months, his blurred vision and "other symptoms" went away.

In regard to notations of hypertension and high blood pressure in Mr. Kees' pre-application medical records, Mr. Kees stated that he does not recall being diagnosed with such aliments. Mr. Kees asserts that, as he disclosed on the insurance application, he thought he was in good health.

After reviewing Mr. Kees medical history, Celtic did not pay on Mr. Kees' claim for benefits. In response, Mr. Kees sent one letter to Celtic dated September 25, 2000, typed, and also dated September 5, 2000, handwritten. In the letter, Mr. Kees states that a SmithKline Beecham report dated March 4, 1999 indicated that his system was "out of whack." Mr. Kees explains that he was drinking large amounts of orange juice at the time. He also enclosed his lab work of March 5, 1999, which referenced his abnormal blood count. He also submitted a report dated May 25, 1999, indicating that

his blood work was "back to normal." Mr. Kees also went on to describe and explain his heart related condition. In the letter, he indicates that he only changed his insurance to Celtic to help his insurance agent, which is his son-in-law, with a sale and that he thought it was also better insurance. Mr. Kees states that he never would have changed insurance if he had known that he was having health problems and that before March 4, 1999, he had not been to the doctor in 25 years. In closing, Mr. Kees states, "I hope this information will be helpful in your consideration of the claims that have been sent into you. Please feel free to call me for any editorial *(sic)* information."

## MOTION FOR SUMMARY JUDGMENT AND APPLICABLE LAW

### Misrepresentation Increased the Risk of Loss

Because this is a action is based in diversity, Tennessee law applies. According to T.C.A. § 56-7-103:

> No written or oral misrepresentation or warranty herein made in the negotiations of a contract or policy of insurance, or in the application therfor, by the insured or in the insured's behalf, shall be deemed material or defeat or void the policy or prevent its attaching, unless such misrepresentation or warranty is made with the actual intent to deceive, or unless the matter represented increases the risk of loss.

Accordingly, the mere fact that an insured made a false statement on an insurance application, in itself, does not necessarily void an insurance policy. *Clingan v. Vulcan Life Insurance Company*, 694 S.W.2d 327, 330 (Tenn.App.1985). The insurer must prove that the insured's answers in the application were false and that either 1) the

7

insured's false answers were provided with the intent to deceive or 2) that the insured's false answers increased the risk of loss. *Womack v. Blue Cross and Blue Shield*, 593 S.W.2d 294, 295 (Tenn. 1980).

The jury determines if the insured's answers on the application were true or false, unless the minds of reasonable men could reach only one conclusion as to the truth or falsity of the answers. *Id.* If the insured's answers in his application are determined to be false, the jury will also decide whether the insured provided false statements with the actual intent to deceive. *Id.* On the other hand, a determination of whether the false answers increased the risk of loss is a question of law for the court. *Id.*

It is the insured's duty to fairly disclose the facts, which means that the applicant must give information that is material to the risk involved. *Clingan*, 694 S.W.2d at 330. Tennessee courts have found that insured's failure to disclose prior diseases or disabilities on an insurance application increased the risk of loss, which voided the policy. *Id*. Furthermore, the fact misrepresentation need not be with reference to a hazard, which actually produced the loss in question. *Loyd v. Farmers Mutual Fire Insurance Company*, 838 S.W.2d 542, 545 (Tenn.App.1992). Any representation in an application for insurance, which naturally and reasonably influences the judgment of the insurer in making the contract, is a misrepresentation that increases the risk of loss. *Lane v. Travelers Indemnity Company*, 499 W.W.2d 643 (Tenn.App.1973); *Milligan v. M.F.A. Mutual Insurance Company*, 497 S.W.2d 736 (Tenn. App.1973).

8

It is not necessary to find that the policy would not have been issued had the facts been disclosed on the application. Rather, it is only necessary or sufficient to find that the insurer was denied information which it sought to discover in good faith and to which it must have deemed necessary to an honest appraisal of insurability. *Clingan*, 694 S.W.2d at 330-331. In determining materiality of misrepresentations in application for insurance, one relevant consideration is the presence or absence of direct inquires as to specific diseases. *Little v. Washington Nat. Ins. Co.*, 241 S.W.2d 838, 841 (Tenn.App.1951). Inquires into specific diseases indicates that the insurer may regard it as material to the risk, and it is the duty of the applicant to fully and frankly disclose the true condition as known to him. *Id.* If a misrepresentation is found to increase the risk of loss, the policy is voidable under the statute even if the misrepresentation was innocently made. *Lane v. Travelers Indemnity Co.*, 499 S.W.2d 643 (Tenn. App. 1973); *see also Bagwell v. Canal Ins. Co.*, 663 F.2d 710, 711 (6th Cir. 1981).

Question 2 on Mr. Kees' application, in the section entitled "Specific Health Conditions," inquired:

> Have you or any dependent(s) to be insured ever been treated for, had symptoms of, or been advised or counseled that they have or may have had a heart condition, (including a heart murmur), stroke, high blood pressure or other circulatory disorder; . . . diabetes; . . . liver, kidney, genital or urinary tract disorder . . . ?

Mr. Kees responded "No" to Question 2 and asserts that, at the time of the application, he was and had been in good health.

Question 2 asks specific questions, which elicits more information than

9

diagnoses, characterizations, applicant's knowledge, and general health. The questions states: (1) Have you ever been treated for the listed medical conditions; (2) Have you ever had symptoms of the listed medical conditions; (3) Have you ever been advised or counseled that you may have the listed medical conditions; (4) Have you ever been advised or counseled that you may have had the listed medical conditions?

Although Mr. States "No" to all above questions, Mr. Kees states in his affidavit that his optometrist examined his eyes for blurred vision and suggested to him that his blurred vision could be a possible diabetic symptom. Furthermore, he admits that his local medical physician examined and performed tests on him and told him that he had some sort of possible temporary diabetes. Mr. Kees admits that he was prescribed a sugar meter. Also, he was placed on medication according to the medical records. Although Mr. Kees believes and asserts that any problems that he may have experienced were short term and caused by diet, at the very least, Mr. Kees was advised and counseled that he may have had diabetes, and he had experienced symptoms typical of diabetes.

Furthermore, Question 3 on the Medical Questionnaire states:

> Have you or any dependent(s) to be covered been hospitalized or had medical or surgical consultation, advice or treatment for any condition(s) (including medication, psychological or martial counseling or therapy), or been advised of any abnormal test results or laboratory findings during the past 24 months? Are you or any dependent(s) to be covered scheduled for or awaiting the results of any tests, biopsies, procedures or lab work?

Mr. Kees did respond "Yes", indicating that he had only one check up "before dieting" in the past 24 months and that he was fully recovered from the medical condition. Mr. Kees failed to report that he had three other appointments with his local physician within 6 ½ months of his application. Additionally, Mr. Kees admits omitting a consultation with his optometrist for blurred vision. Further, Mr. Kees failed to disclose the results of abnormal tests and laboratory findings that he referenced in his affidavit and letter to Celtic. In response to requests for information regarding the August 31st check up, Mr. Kees reported that the results of the check up were "Fine." Contrary to his report, the medical records indicate that Mr. Kees had borderline high blood pressure and that he was prescribed glucotrol once a day.

Mr. Kees insists that Celtic is estopped from relying upon its defense in this case because Celtic was given the name of Mr. Kees' physician and did not make sufficient effort to ascertain the medical records and condition of Mr. Kees. However, since the answers given in the insurance application were negative to medical problems or conditions, it is not necessary for the insurer to look further in consulting doctors. *Jefferson Standard Life Insurance v. Webb*, 406 S.W.2d 738, 742 (Tenn.App.1966); *Bauer v. Mutual of Omaha Insurance Company*, 406 S.W.2d 366 (Tenn.App.1969). Mr. Kees had answered in the negative to any health problems and had not indicated a history of any health problems.

Celtic presents as an affiant, Ms. Debra Topal, who is the vice president of Celtic; who has been in the insurance business for 25 years; and who is familiar with the

11

industry underwriting standard, as well as Celtic's underwriting standards. She states that prior consultations with physicians are predicators of future health related problems. Further, she states that the applicant's medical history is vital to the assessment of insurability. Ms. Topal examined Mr. Kees application of insurance and deposes that the "omitted information is the type of information which is vital in Celtic's determination of whether to accept a risk and issue a policy." Moreover, Ms. Topal asserts that had Celtic known the above medical history of Mr. Kees at the time of his application, Celtic would have declined to issue him insurance.

Of importance, Celtic actually followed up on the limited information they were given by sending a supplemental questionnaire. They had expressed an interest in the known doctor's visits and considered them in providing coverage. If Mr. Kees had answered the questions truthfully, Celtic could have taken additional measures to make a "honest appraisal of insurability." It is apparent from Ms. Topal's sworn statements and Celtic's actions in the application process that Celtic would have conducted a closer inspection of Mr. Kees medical condition in order to assess the risks posed by diabetes, hypertension, and blood pressure problems. However, because of Mr. Kees misrepresentations, Celtic was denied this opportunity.

The parties could disagree as to the severity of Mr. Kees' medical problems; Mr. Kees' knowledge of his medical condition (above what he has expressed in the pleadings); Mr. Kees' characterization of his medical condition; and the general health of Mr. Kees. However, these are not the issues before the Court to consider. The issue

before the Court is whether Mr. Kees provided truthful and complete information *to the specific questions* that he was asked in the application process and whether such misrepresentation materially increased the risk of loss for Celtic.

The Court finds that reasonable minds could not disagree that Mr. Kees provided false information and/or withheld information in regard to his medical condition. Further, the Court opines that this false and incomplete information materially increased the risk of loss for the defendant. In particular, diabetes is an impairment or disease that Celtic was entitled to be advised of under the Medical Questionnaire. Diabetes can be a debilitating disease requiring long term healthcare services at great expense. As such, Celtic specifically requests information regarding diabetes from each applicant. Furthermore, hypertension, abnormal blood pressure, prescribed medication, and abnormal test and laboratory results, should have been reported, as they affect insurability as well. Celtic should have been given true and complete information, which it sought to discover in good faith, and which it deemed necessary to an honest appraisal of plaintiff's insurability. Mr. Kees denied Celtic this information. As a result, his policy is void, and benefits are denied.

**Bad Faith Penalty**

According to T.C.A. § 56-7-105:

(a) The insurance companies of this state, and foreign insurance companies and other persons or corporations doing an insurance or

13

> fidelity bonding business in this state, in all cases when a loss occurs and they refuse to pay the loss within sixty (60) days after a demand has been made by the holder of the policy or fidelity bond on which the loss occurred, shall be liable to pay the holder of the policy or fidelity bond, in addition to the loss and interest thereon, a sum not exceeding twenty-five percent (25%) on the liability for the loss; provided, that it is made to appear to the court or jury trying the case that the refusal to pay the loss was not in good faith, and that such failure to pay inflicted additional expense, loss, or injury including attorney fees upon the holder of the policy or fidelity bond; and provided further, that such additional liability, within the limit prescribed, shall, in the discretion of the court or jury trying the case, be measured by the additional expense, loss, and injury including attorney fees thus entailed.

Accordingly, in order to recover bad faith penalties, a claimant must prove that (1) the policy of insurance has, by its terms, become due and payable, (2) a formal demand for payment was made, (3) the insured waited sixty days after making demand before filing suit, unless there was a refusal to pay prior to the expiration of the sixty days, and (4) the refusal to pay was not in good faith. *Walker v. Tennessee Farmer's Mut. Ins. Co.*, 568 S.W.2d 103 (Tenn.App.1977); *Stooksbury v. American Nat. Property and Cas. Co.*, 126 S.W.3d 505 (Tenn.App.2003). The burden of proving that an insurance company acted in bad faith in refusing to pay a claim such that a plaintiff is entitled to a bad faith penalty lies with the plaintiff. *Nelms v. Tennessee Farmers Mut. Ins. Co.*, 613 S.W.2d 481, 484 (Tenn.App.1978).

Mr. Kees' claim for bad faith simply fails in that the policy of insurance never became due and payable and the claim was denied in good faith.

14

## **CONCLUSION**

For the reasons hereinabove set forth, defendant's motion for summary judgment on both of plaintiffs' claims is **GRANTED.**

**IT IS SO ORDERED.**

                                            **ENTER:**

                                            S/Thomas W. Phillips_____
                                            United States District Judge